## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CHATMAN ELECTRIC, INC.,**

    **Plaintiff,**

    **v.**

**INTERIOR SYSTEMS, INC.,**

    **Defendant.**

**Civil Action No.  04-2117 (JMF)**

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

### Introduction

This case arises out of a contract dispute between plaintiff, Chatman Electric, Inc. ("CEI"), and defendant, Interior Systems, Inc. ("ISI").  CEI, a Maryland corporation with its principal place of business in Virginia, sued ISI, a District of Columbia corporation with its principal place of business in Virginia, for breach of contract arising out of two construction projects.  Both the Reeves project, located at 14th and U Streets, N.W., Washington, D.C. and the Department of Employment Services ("DOES") project, located at 609 H Street, N.E., Washington, D.C. are buildings owned by the government of the District of Columbia.

ISI hired CEI to perform power and conduit work on both projects.  CEI claims that it performed the work but was not fully paid.  CEI seeks $99,905 for the Reeves project and $11,900 for the DOES project, for a total in damages of $111,805 plus interest.  ISI claims that it has paid in full for the services CEI provided.

### FINDINGS OF FACT: DOES PROJECT

**The Contract**

1.      On August 26, 2002, ADT Security Services, Inc. ("ADT") contracted with ISI to

have work performed on the DOES project for $58,350. Tr. 1[1] at 71 (testimony of Mel Pulley,

Director of Communications for ISI); Joint Exhibit ("JEX") 4.

2.      ISI then prepared a Budget/Project Authorization ("B/PA")[2] for the DOES project.

ISI then sought a quote from CEI. Tr. 1 at 70 (testimony of Pulley); JEX 6.

3.      On September 24, 2002, CEI submitted a proposal to ISI for power and conduit[3]

work on the DOES project. JEX 6 at 1.  CEI proposed completing the work for the price of

$29,900, due within fifteen days from the date of the completion of the job.[4] Id.  There was no

written subcontract agreement between ISI and CEI on the DOES project, just an oral agreement.

Tr. 1 at 73 (testimony of Pulley).

**The Dispute**

---

[1] "Tr. 1" refers to the transcript of the morning session of this trial, which occurred on August 8, 2005.  "Tr. 2" refers to the afternoon session.

[2] A B/PA enables ISI to see if the job will be profitable, based on estimates of the amount of labor that will be required. Tr. 2 at 10 (testimony of Felix Yeoman, Chief Financial Officer for ISI); JEX 22.  Once the Chief Operating Officer approves the B/PA, it goes to the accounting department, where it receives a job number. Id. at 12.  Employees working on the job then use that number to code their time sheets. Id.  The number of hours that each employee worked on a particular job is ultimately captured in a Time by Job Summary. Id. at 10-11.

[3] "Conduit is a raceway that gives the electrical conductors a mechanical and security protection." Tr. 1 at 10 (testimony of Jim Chatman, President, owner and master electrician of CEI).

[4] The industry standard for the payment of subcontracts is that the contractor pays the subcontractor within three days of receiving payment from the owner. Tr. 1 at 43 (testimony of Chatman).

4.      On October 24, 2002, CEI invoiced ISI for the work done on the DOES project.

JEX 6 at 2.

5.      According to Chatman, although the invoice charged $29,900, following ISI's

request that the bill be reduced, a statement was inserted at the bottom of the invoice indicating

that if ISI paid $10,000 by October 25, 2002 and $10,000 by November 1, 2002, CEI would

reduce the total amount due to $20,000. JEX 6 at 2; Tr. 1 at 60 (testimony of Chatman).

Chatman also indicated that the original price of the contract was approximately $50,000. Tr. 1 at

60 (testimony of Chatman).

6.      Pulley, however, claimed that he asked Chatman to split the work on the DOES

project because two of CEI's technicians had finished their work on a different project and CEI

needed to keep them working. Tr. 1 at 71 (testimony of Pulley).  According to the B/PA prepared

by Pulley, CEI was to perform $18,350 worth of work on the DOES project while CEI was to

perform $18,598 worth of work. DEX 22.  This agreement was never memorialized in writing

but remained a "verbal gentleman's agreement." Tr. 1 at 77 (testimony of Pulley).

7.      While the DOES project was ongoing, Pulley asked Chatman to pull an electrical

permit for him in relation to another job. Tr. 1 at 61 (testimony of Chatman).  Chatman agreed to

do so and told Pulley that it would cost $2,000. Id. (testimony of Chatman).  The price of the

permit itself was $100. Id.  Chatman stated that the remainder of the $2,000 bill was for time

spent retrieving the permit. Id. (testimony of Chatman).

8.      On November 6, 2002, ISI paid CEI $2,000. JEX 13; Tr. 1 at 100 (testimony of

Pulley).  Pulley explained however that the additional $2,000 check was partially in payment for

the permit Chatman had obtained and partially in payment for the work that had been done on the

DOES project. Tr. 1 at 99-100 (testimony of Pulley); Tr. 2 at 23-24 (testimony of Yeoman).

9.      On January 8, 2003, ISI paid CEI $18,000. JEX 13.

10.      I credit the testimony of Chatman and find that CEI agreed to perform the work on this project for $29,900 with the understanding that CEI would accept $20,000 ($10,000 by October 25, 2002 and $10,000 by November 1, 2002) with the difference being a discount for prompt payment.

11.      I find that ISI paid $18,000 in January, 2003 and did not therefore earn the discounts for prompt payment.

12.      I find that a $2,000 payment by ISI to CEI was for pulling the permit and should not be credited against the amount due.

13.      I therefore find that CEI is due $11,900.

14.      I discredit the testimony that there was an independent gentlemen's agreement to pay an amount less than the $29,900 proposed by CEI.

### FINDINGS OF FACT: REEVES PROJECT

#### The Contract

15.      In the fall of 2002, the government of the District of Columbia contracted with ISI to perform work on the Reeves Center. Tr. 1 at 78-79 (testimony of Pulley); JEX 21.  The total price of the contract between the District and ISI was $387,000. JEX 21.

16.      On July 1, 2002, CEI submitted a proposal to ISI for conduit and wiring work at the Reeves building. JEX 1.  Chatman personally prepared the proposal based on the bid drawings provided to CEI by ISI. Tr. 1 at 14 (testimony of Chatman).  CEI proposed completing the work for the price of $148,250. Id.

17.     On September 23, 2002, Pulley, signing on behalf of ISI, accepted CEI's proposal.

Id.

18.     On July 2, 2002, Chatman signed and dated ISI's standard subcontract agreement

for the work to be performed on the Reeves project.[5] JEX 2.  Attachment A to the subcontract

was the statement of work to be performed by CEI:

> 1.   Install all designated A/C power and conduit, as shown. Exterior receptacles to be ground fault circuit interrupters in weatherproof boxes.
> 2.   Install conduit as shown.  Exterior conduit will be compression fittings.  Roof top conduit to be on pressure treated lumber[.]
> 3.   [S]ignal and communication wire furnished and installed by others[.]
> 4.   Fireproof patching for new work only done by Subcontractor[.]
> 5.   12x12 and 24x24 junction boxes to be Hoffman-type hinged cover with lock position[.]
> 6.   Conduit runs to devices.  Devices mounted and installed by others[.]
> 7.   Camera mounts installed by Subcontractor, camera mounts supplied by others[.]
> 8.   Allowance for floor X-ray: $3,000.00[.]
> 9.   Plywood backing in 24x24 boxes to be pressure treated[.]
> 10.  Lightning protection by others[.]
> 11.  Interface with fire alarm[.]  Subcontractor will supply four conductors wired to terminal block in fire control room. Owner of building to make final connection at fire alarm control panel[.]
> 12.  Customer to provide parking for two vehicles and free accessed [sic] to site during project period[.]

Id., Attachment A.

---

[5] The only change to the standard subcontract agreement was made by Chatman, who crossed out paragraph 12 of the agreement, captioned "Indemnification." Id., page 2; Tr. at 16 (testimony of Chatman).

The last paragraph of the subcontract agreement stated the terms governing changes to the

original contract:

> This Agreement sets forth the entire and only Agreement between
> ISI and the Subcontractor relative to the subject matter hereof.
> Any representation, promise or condition, whether oral or written,
> not incorporated herein shall not be binding upon either party.  No
> waiver, modification, or amendment to the terms of this Agreement
> shall be effective unless made in writing and signed by an
> authorized representative of the party sought to be bound hereby.

JEX 2 at page 4.

According to paragraph 6 of the subcontract, termination of the contract could occur

under the following conditions:

> ISI may terminate this subcontract for default by delivery to the
> Subcontractor of a Notice of Termination specifying the reason for
> the termination and the date upon which such termination becomes
> effective.  If the Subcontractor fails to cure the default within 5
> days after receiving a notice specifying the default, ISI may
> terminate the contract.  Subcontractor shall be paid for all work
> completed up to the date of termination subject to set off for
> corrective work.

JEX 2 at 1.

## Performance

19.    On November 5, 2002, CEI submitted an invoice to ISI for the work performed on

the Reeves project. Tr. 1 at 43 (testimony of Chatman); JEX 7.  The total contract value of the

work was listed as $148,250. JEX 7.

20.    According to the invoice, as of November 5, 2002, 98% of the contract value of

the work had been completed. Id.  According to Chatman, certain work was not completed

because CEI was waiting for ISI to 1) install security gates in the stairways, 2) install the guard

6

desk, and 3) provide CEI with access to the roof. Tr. 1 at 18 (testimony of Chatman).  Chatman

estimated that collectively, this amounted to $2,500 - $3,000 worth of work. Id. at 20 (testimony

of Chatman).

21.     In addition, Chatman noted that because CEI had previously received a payment

of $75,000 from ISI, id. at 96 (testimony of Pulley), it only sought an additional $2,965. Id. at 18

(testimony of Chatman).

22.     On February 25, 2003, CEI faxed ISI an invoice for $72,035.00. PEX 1.

According to the invoice, 98% of the work had been completed. Id. at 2.  The invoice reflected

payment of the previously billed $75,000 and sought an additional $10,285. Id.; Tr. 1 at 46

(testimony of Chatman).

### The Dispute

23.     Typically, ISI would receive shop or construction drawings[6] from ADT and then

pass them on to Chatman or one of his representative. Tr. 1 at 83-84 (testimony of Pulley).  If

modifications to the original plans were sought, ISI would have to submit to the government a

written request to modify the order. Tr. 2 at 28 (testimony of Yeoman).  If the change was

approved, the government would then provide ISI the money to pay for the changes. Id.

(testimony of Yeoman).

24.     According to Chatman, ISI instructed CEI to began working on the Reeves project

based on the drawings in its possession at the time. Tr. 1 at 47 (testimony of Chatman).  Chatman

further indicated that it was only when ADT asked CEI for its "as built" drawings so that they

---

[6] Standard industry practice contemplates the creation of bid drawings and then final shop
drawings. Tr. 1 at 83 (testimony of Pulley).

could be updated, that he then understood that changes were going to be made. Id. at 48

(testimony of Chatman).  In October of 2002, CEI received revised drawings from ADT. Id. at 39

(testimony of Chatman).  Copies of the revised drawings were also provided to ISI. Id. (testimony

of Chatman).

25.     Chatman was on the job site almost daily. Tr. 1 at 20 (testimony of Chatman).  In

addition to the work specified in the original contract, CEI performed extensive additional work

on the project. Id. at 21 (testimony of Chatman).  The additional work that was performed was

not indicated on the original drawings CEI received. Id. (testimony of Chatman).  Changes to the

original drawings were made on every level of the building including the roof. Id. at 24

(testimony of Chatman).

26.     For example, on a typical doorway, in order to allow for the operation of a card

reader, the original bid drawings called for the installation of conduit that would terminate above

the doorway. Tr. 1 at 24 (testimony of Chatman).  The new drawings, however, called for the

installation of conduit around the doorway. Id. (testimony of Chatman).  In addition, the new

drawings called for the installation of a second conduit on the roof to supply 110-volt power for

cameras. Id. at 26 (testimony of Chatman).

27.     Chatman asked Pulley for a change order to reflect the additional work that was

being performed. Tr. 1 at 50 (testimony of Chatman).  Pulley did not provide Chatman with any

written change orders but did verbally indicate to Chatman that he should go ahead with the

work. Id. at 51 (testimony of Chatman).

28.     CEI mailed and faxed ISI an invoice for the additional work, identifying the work

performed by the print number of the plans, a description of what was added to the plans by ISI, a

description of what was added to the plans by ADT, the cost of the additional labor,[7] and the cost of the additional materials. Tr. 1 at 27-30 (testimony of Chatman); PEX 2.

29.     Chatman testified that toward the end of the contract, he called Pulley many times but Pulley refused to talk to him. Tr. 1 at 57 (testimony of Chatman).  Pulley, in turn, claimed that he told Chatman that he needed to do a walk-through with Chatman and the client but that Chatman was unavailable. Tr. 1 at 98 (testimony of Pulley).

30.     Chatman claimed he never received any notice of termination and that he continued to check on the job, hoping to complete the final three items but that at a certain point he discovered that the work had already been completed. Tr. 1 at 58 (testimony of Chatman).

31.     According to Pulley, CEI should have been able to complete the three unfinished tasks without any additional work and ultimately, it wasn't ISI's responsibility to do those things. Tr. at 88.  ISI never delivered CEI a Notice of Termination, as contemplated by the agreement. Rather, ISI insisted that it hired several other subcontractors to complete the work that CEI was supposed to perform but did not.

32.     On July 24, 2003 and on September 18, 2003, AVA Electric Co. submitted proposals to ISI for work to be performed on the Reeves project. Tr. 2 at 40 (testimony of Derrick Moore, Project Manager and Sales Manager for Labor at AVA); DEX 2.  Both proposals were accepted by ISI. Id.  In the first submission, dated July 24, 2003, AVA proposed to provide electrical support for the price of $10,441.68. DEX 2 at 2.  In the second submission, dated

---

[7] Chatman calculated the amount of the labor required for the additional work based on his experience in the business and the Means Cost catalogue. Tr. 1 at 28 (testimony of Chatman). The Means Cost catalogue provides electrical cost data and is accepted by both the government for the District of Columbia and the federal government. Id. (testimony of Chatman).

September 18, 2003, AVA proposed to do the following:  1) provide 2 core drills at the front

security desk, 2) provide x-ray for the front security desk, 3) provide the completion of the

existing power to the roof-mounted cameras, and 4) install a transformer for one of the cameras.

Tr. 2 at 39 (testimony of Moore); DEX 2 at 1.  The price listed on the second proposal was

$7,363.52. DEX 2 at 1.  Ultimately, AVA did not perform the core drilling work but gave ISI the

number of another company, Testing Technologies,[8] and the charge was removed from the

pricing proposal. Tr. 2 at 41-42 (testimony of Moore).  In the end, AVA billed approximately

$15,000 for their work. Id. at 42 (testimony of Moore).[9]

33.     Additional work on the Reeves project was also performed by Mike Lyons of

Worldwide Wiring. Tr. 2 at 45 (testimony of Lyons).  Lyons, a master electrician, installed

"empty conduits throughout the building for installation of signal cable for the security devices

and associated equipment." Id. at 46 (testimony of Lyons).  Lyons was unable to complete three

items, the same three items CEI had been unable to complete: 1) he couldn't run conduit to four

steel gates on the first floor in the stairwell because they were not installed, 2) he couldn't run

conduit underneath the floor to the guard station on the first floor lobby until the guard station

was replaced, and 3) he couldn't get access to a small section of the roof to perform an additional

half hour of work. Id. at 46-47 (testimony of Lyons).  Lyons completed his work in the summer

of 2003. Id. at 48 (testimony of Lyons).

34.     On January 12, 2004, CEI invoiced ISI for $99,905. PEX 2 at 1.  According to the

---

[8] ISI did hire Testing Technologies, Inc. to x-ray the floor and core drill the holes. Tr. 1 at
108 (testimony of Pulley).

[9] The actual amount was $17,200. Tr. 1 at 90 (testimony of Pulley).

invoice, 100% of the previously contracted work had been completed. Id.  The invoice also indicated that $73,250 was due for previously contracted work and that an additional $26,655 was due for work not originally contemplated. PEX 2; Tr. at 49 (testimony of Chatman).

## FACTUAL CONCLUSIONS AS TO THE DOES PROJECT

1.      I find that it is more likely than not that CEI performed 100% of the work it agreed to complete but that ISI only partially paid CEI.

2.      I find that it is more likely than not that CEI offered ISI a discount if payment was made by a date certain but that ISI failed to take advantage of such offer.

## FACTUAL CONCLUSIONS AS TO THE REEVES PROJECT

1.      I find that it is more likely than not that CEI performed 98% of the work due under the contract and was unable to complete the remainder of the work because the steel gates in the stairwell and the guard desk were not installed and because it could not secure the necessary access to the roof of the building.

2.      I find that it is more likely than not that CEI performed the additional work for which it submitted invoices and that ISI authorized this work.

3.      While there is no dispute that AVA Electronics performed additional work on the Reeves project, there is no evidence that permits me to conclude that it is more likely than not that this was work CEI should have performed but did not.

4.      I discredit the testimony of Pulley that CEI only completed 60% of the work. There is no record evidence supporting that estimate and it is contradicted by the testimony of two objective witnesses, Lyons and Buchanan, neither of whom are now employed by CEI. According to them, 1) ISI never complained to CEI that some 40% of the job was not completed

11

and 2) they were not aware that ISI had to complete work CEI had not done.

5.      Pulley's estimate that only 60% of the work was completed is contradicted by the fact that AVA only received $17,300 for its work, which is much less than 40% of the contract price and by the absence of any specific documentation of the work ISI had to do to complete what CEI had not done.

## CONCLUSIONS OF LAW

This is a diversity case and controlled by District of Columbia law. Horton v. Liberty Mut. Ins. Co., 367 U.S. 348, 352-53 (1961).

As to both projects, CEI sent an invoice, representing the amount due under the contract. ISI's failure to pay the amounts due constitutes a breach of the contracts, entitling CEI to the payments due, plus pre-judgment interest, so that CEI can be placed in the position in which it would have been had ISI not breached the contracts. Allen v. Yates, 870 A.2d 39, 52 (D.C. 2005).

As to the Reeves project, I have found that CEI performed additional work not required by the contract, at the request of ISI.  Oddly, there was no provision in the contract that spoke specifically to change orders or required that they be in writing and approved by ISI before the work was done.  Additionally, it is the law of the District of Columbia that a provision that requires written approval of change orders does not bar recovery for extra work done upon the oral commands of ISI's agents and employees. Shapiro v. Bimblich, 101 A.2d 890, 892 (D.C. 1954).  If that is true when the contract contains a provision requiring written change orders, then, *a fortiori*, it also has to true when there is not.

Furthermore, District of Columbia law implies a contract to pay for services performed

12

when 1) valuable services are rendered by the plaintiff, 2) for the person from whom recovery is sought, 3) which services are accepted and enjoyed by that person, 4) under circumstances that reasonably notified the person that the plaintiff, in performing such services, expected to be paid. United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co., Inc., 81 F.3d 240, 246-47 (D.C. Cir. 1996); Perles v. Kagy, 362 F. Supp. 2d 195, 202-203 (D.D.C. 2005); TVL Assocs. v. A & M Constr. Corp., 474 A.2d 156, 159 (D.C. 1984).  I have found that those requirements were met here.  CEI performed work at ISI's direction, ISI accepted the work, and CEI reasonably expected to be compensated for the work done at ISI's direction.  CEI is therefore entitled to be compensated.

Thus, the failure of ISI to pay the contract balance due on the Reeves project, i.e., $70,285, constitutes a breach of the contract, entitling CEI to that balance. Lee v. Foote, 481 A.2d 484, 486 n.3 (D.C. 1984).  CEI is also entitled to $26,655 for the additional work performed. Id.

I also find that CEI is entitled to pre-judgment interest on the balances due on both projects,[10] calculated at a rate of 6% per annum.[11]

1.     $72,035 on the Reeves project, due on February 25, 2003,[12] per the invoice that is PEX 1.

---

[10] D. C. Code § 15-508; Bragdon v. Twenty-Five Twelve Assocs. Ltd. P'ship, 856 A.2d 1165, 1172 (D.C. 2004).

[11] District of Columbia v. Pierce Assocs., Inc., 527 A.2d 306, 311 (D.C. 1987).

[12] The date on the actual invoice is April 15, 2003, although Chatman testified at trial that the invoice was actually dated February 25, 2003, the date of the fax cover sheet, and that on reproducing a copy of the invoice in preparation for trial, the current date was inserted on the invoice. Tr. 1 at 45 (testimony of Chatman).

2.      $99,905 on the Reeves project, due on January 12, 2004, per the invoice that is PEX 2.

3.      $11,900 on the DOES project, due within fifteen days of October 24, 2002, the date of the invoice that is JEX 6.[13]

Within ten days of the issuance of this Findings of Fact, Conclusions of Law, and Memorandum Opinion, the parties shall submit a joint praecipe stipulating to the total amount due plaintiff, with the understanding that by doing so neither party waives any objection to the findings of fact I have made and the conclusions I have drawn.  Such praecipe shall include an explanation of how the parties derived the final amount.  At that point, the Clerk will enter final judgment.

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

Dated:

---

[13] Although CEI's proposal for the DOES states that payment is due within fifteen days from the completion of the job, there was no testimony at trial as to the actual date of completion. The court will therefore use the October 24, 2002 date of CEI's invoice as the starting date for the fifteen day period.

14